[No. 14393–0–I.   Division One.   January 13, 1986.]

THE STATE OF WASHINGTON, *Respondent,* v. SHAWN RAYMOND MCINTOSH, *Appellant.*

*Scott A. Reiman,* for appellant (appointed counsel for appeal).

*Norm Maleng, Prosecuting Attorney,* and *Sally Stanfield, Deputy,* for respondent.

CORBETT, C.J.—Shawn Raymond McIntosh appeals the order deferring imposition of sentence for the offenses of second degree burglary and first degree possession of stolen property. He assigns error to the court's denial of his motion to suppress physical evidence, asserting that his arrest and the subsequent search and seizure of evidence were unlawful. We affirm.

At 4 a.m. on October 17, 1983, King County Police Officers Susan Sherwood and Roger Bleiler were separately doing routine checks of businesses in the city of Woodinville in an area which had experienced a high incidence of burglaries. Sherwood observed that the vehicle driven by McIntosh had a defective license plate lamp. She stopped the vehicle and approached the driver's side, while Bleiler, who had pulled up behind her, approached the other side to speak to Michael O'Neal, the passenger. Sherwood asked McIntosh for his driver's license and the vehicle registration. He told her that he had never had a driver's license and had no other identification.

Sherwood observed a blue 2–wheeled cart in the backseat of the vehicle and a black wool–type hat in the front seat. The officers also noticed that both men's shoes and pant legs were wet, grassy, and dirty. O'Neal said that they became dirty in the yard of an apartment complex where they had been at a party. Sherwood was familiar with the

area and found this explanation illogical. Bleiler saw that McIntosh wore a knife in a pocket sheath on his right hip.

Sherwood took McIntosh to the rear of her patrol car, advised him that he was under arrest for not having a valid operator's license, patted him down for weapons, and removed the knife. She felt bulges in his pockets. She then conducted a search of his person and "pulled out a couple of pieces" of jewelry.

While Sherwood was talking to McIntosh at the rear of her patrol car, Bleiler was talking to O'Neal, and he observed a "pipe–looking object" protruding from under the front seat of the vehicle which he thought looked like the barrel of a weapon. Bleiler had observed the knife on McIntosh and, as a precautionary matter, asked O'Neal to step out of the car. Bleiler then reached under the seat to determine the nature of the protruding object. Before he could reach the pipe, his hand touched several objects under the seat. He found two pairs of gloves and a radio device which he removed in order to get to the pipe–like object. Again, reaching for this object, he felt something else which he pulled out from under the seat and found it to be a dent puller. In removing the pipe–like object he determined that it was only a length of pipe. However, Bleiler, believing that the objects he had found were burglary tools, became suspicious of O'Neal. Sherwood asked Bleiler to pat down O'Neal, during which time he found a knife in a sheath on O'Neal's hip, a small Crescent wrench, and a penlight which, in association with the other items, Bleiler believed were burglary tools. Sherwood had Bleiler read McIntosh his rights while she completed the search of his person. She found 40 pieces of jewelry in his pants pocket.

Sherwood radioed for backup. When the other officers arrived, they looked at some of the jewelry and noticed that each piece was imprinted with "F.O.E.," the symbol for the Fraternal Order of Eagles. Officers went to check two Eagles clubs in the area, and it was discovered that the Redmond Eagles club had been burglarized. A warrant was

obtained for the search of the car which produced two safes from the Eagles club together with what appeared to be burglary tools.

McIntosh argues that the evidence found on his person, which led to the discovery of the burglary and search of the vehicle, should be suppressed because his arrest was unlawful. He first contends that Officer Sherwood had no authority to arrest him for a minor traffic violation.

A police officer may arrest a person without a warrant for committing a misdemeanor only when the offense is committed in the presence of the officer, RCW 10.31.100, except as provided in RCW 10.31.100(1)–(5). Driving without a driver's license on the person is a misdemeanor, RCW 46.20.021, not a traffic infraction for which one may not be arrested, RCW 46.63.020(8). Issuance of a citation after arrest for a traffic misdemeanor is discretionary with the arresting officer.

> Whenever any person is arrested for any violation of the traffic laws or regulations which is punishable as a misdemeanor or by imposition of a fine, the arresting officer *may* serve upon him a traffic citation and notice to appear in court. . . . The arrested person, in order to secure release, and *when permitted by the arresting officer,* must give his written promise to appear in court . . .

(Italics ours.) RCW 46.64.015. Officer Sherwood was faced with a person who had no identification, who did not claim to own the vehicle he was driving, and who had related a suspicious account of his activity during the preceding evening. It was reasonable for her to assume that McIntosh would not respond to a citation if she issued one. These unique facts distinguish this case from *State v. Hehman,* 90 Wn.2d 45, 578 P.2d 527 (1978), relied upon by McIntosh. Although *Hehman* contains the statement that "as a matter of public policy . . . custodial arrest for minor traffic violations is unjustified, unwarranted, and impermissible if the defendant signs the promise to appear as provided in RCW 46.64.015", *Hehman,* at 47, the court recognized that release is not required for those who fail to furnish satis-

factory evidence of identification and for those who the officer has reasonable and probable grounds to believe will disregard a written promise to appear in court. *Hehman,* at 47–48. *See also* JCrR 2.01(b)(1)(i), (iii).

This case may be further distinguished in that *Hehman* was written in anticipation of the decriminalization of traffic infractions. With decriminalization, the Legislature left with the police the power of arrest for certain traffic misdemeanors, including driving without a license on the person. Although we must follow *Hehman* and generally disapprove of a full search incident to a traffic arrest, the unique facts of this case permitted the arrest and search.

McIntosh only contends that because his arrest was unlawful, the fruits of any search conducted thereto must be suppressed. He does not claim that his arrest was merely a pretext for the search or that the search was not properly incident to the arrest. Therefore, we have not examined the authorities relative to these possible issues.

McIntosh next claims that even if his arrest was valid the search of his person exceeded the scope of a search incident to an arrest.

[W]hen a lawful arrest is made, the arresting officer may search the person arrested and the area within his immediate control. A warrantless search in this situation is permissible only to remove any weapons the arrestee might seek to use in order to resist arrest or effect an escape and to avoid destruction of evidence by the arrestee of the crime for which he or she is arrested.

(Citations omitted.) *State v. Ringer,* 100 Wn.2d 686, 699, 674 P.2d 1240 (1983). *See also State v. Michaels,* 60 Wn.2d 638, 642–43, 374 P.2d 989 (1962). McIntosh argues that because the officer did a *Terry*[1] patdown for weapons before reaching into his pockets, the search of the person could not be for weapons or instruments that could be used for the purpose of escape.

■ This is too narrow a view of the officer's right to

---

[1] *Terry v. Ohio,* 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968).

search a suspect incident to arrest under *United States v. Robinson,* 414 U.S. 218, 38 L. Ed. 2d 427, 94 S. Ct. 467 (1973) and *Gustafson v. Florida,* 414 U.S. 260, 38 L. Ed. 2d 456, 94 S. Ct. 488 (1973), which involved searches incident to arrests for minor traffic offenses. The Court treated all custodial arrests alike for the purposes of search justification. *Robinson,* at 235.

> The authority to search the person incident to a lawful custodial arrest, while based upon the need to disarm and to discover evidence, does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect. A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification. It is the fact of the lawful arrest which establishes the authority to search, . . .

*Robinson,* at 235. While the court in *State v. Hehman, supra* at 49, declined to follow *Robinson* and *Gustafson,* this case is distinguishable from *Hehman* because McIntosh was validly arrested. *See also State v. Chrisman,* 100 Wn.2d 814, 818–19, 676 P.2d 419 (1984).

McIntosh lastly argues that the evidence found by Officer Bleiler in the vehicle should be suppressed because it was the result of a search of the passenger compartment which is not permitted by Const. art. 1, § 7 as interpreted by *State v. Ringer, supra.*

In *Ringer,* the search of the vehicles exceeded the authority of a search incident to arrest. Both defendants in *Ringer* had already been placed under arrest and were sitting handcuffed in a patrol car while their vehicles were searched. In this case, Bleiler investigated what he thought was a weapon under the front seat before either McIntosh or O'Neal were placed under arrest, and it was possible that they could return to the car. *Ringer* is not apposite under these circumstances.

A *Terry* stop and frisk may extend into the car if there is a reasonable suspicion that the suspect is danger-

ous and may gain access to a weapon in the vehicle. *State v. Williams,* 102 Wn.2d 733, 738–39, 689 P.2d 1065 (1984) (discussing *Michigan v. Long,* 463 U.S. 1032, 77 L. Ed. 2d 1201, 103 S. Ct. 3469, 3480 (1983)). The early morning hour, the fact that the driver of the vehicle was armed, the appearance of a weapon under the seat, and the suspicions aroused by the statements and appearances of O'Neal and McIntosh would justify a *Terry* quick check of the vehicle for a weapon.

The trial court properly ruled the arrest of McIntosh valid and properly admitted the evidence found on his person and under the front seat of the vehicle.

Affirmed.

COLEMAN and GROSSE, JJ., concur.

Review denied by Supreme Court March 21, 1986.