[No. 71655-2. En Banc.]
Argued May 16, 2002.     Decided July 3, 2002.

THE STATE OF WASHINGTON, *Respondent*, v. ELLWOOD TSUGIO GLOSSBRENER, *Petitioner*.

*James E. Egan*, for petitioner.

*Ronald S. Zirkle, Prosecuting Attorney*, and *Lauri M. Boyd, Deputy*, for respondent.

BRIDGE, J. — Petitioner, Ellwood Glossbrener, seeks review of his conviction for possession of a controlled substance. He argues that at the time of the search of the passenger compartment of his vehicle, which led to the discovery of the controlled substance, the officer did not have an objectively reasonable concern for his safety. We agree.

I

At approximately 11:45 P.M. on November 8, 1999, Union Gap police officer Carlos Trevino pulled Glossbrener over because his passenger side headlight was not operating. Glossbrener stopped within one-half block. Before coming to a complete stop, the officer noticed Glossbrener reach down toward the passenger side of the car for several seconds. Glossbrener was the only person in the car.

Trevino approached the driver's side of the car and told Glossbrener that he had stopped him because his headlight was out. Trevino smelled alcohol and noticed that Glossbrener's eyes were bloodshot. He asked Glossbrener if he had been drinking and Glossbrener indicated that he had had a couple beers. By this time, Glossbrener had given Trevino his driver's license, registration, and insurance card.

Trevino then asked Glossbrener why he had reached towards the passenger side of the car and Glossbrener replied that he was getting the registration out of the glove box. Trevino told Glossbrener that he had seen him reach for the glove box and remove the registration after he had stopped. He asked Glossbrener whether he had been trying to hide any guns, knives, or other weapons. Glossbrener admitted that he had reached over to hide an alcohol

container.[1] Trevino told Glossbrener to stay in the car while he went back to his patrol car to check for warrants.[2] None was found.

When Trevino returned to Glossbrener's car, he asked Glossbrener if he would perform some field sobriety tests and Glossbrener agreed. Once Glossbrener stepped out of the car, Trevino patted him down for weapons. None was found. After completing the field sobriety tests, Trevino concluded that Glossbrener was not legally intoxicated. He then called Officer Vanicek for backup. While waiting for Vanicek to arrive, Trevino had Glossbrener stand at the right front side of his car.

Upon Vanicek's arrival, Trevino proceeded to search the passenger side of the car, the area in which he thought he had seen Glossbrener reaching prior to coming to a stop, for weapons and "other evidence." He found an open can of beer between the passenger seat and the door. He also found a brass smoking pipe, which appeared to contain marijuana, underneath the passenger floor mat. Trevino testified that he could not remember which item he found first. Trevino placed Glossbrener under arrest. Vanicek searched Glossbrener incident to arrest and found a baggie containing what the officers believed to be methamphetamine.[3] He was not cited for either the headlight or the open container infractions.

Glossbrener was charged with possession of a controlled substance, methamphetamine, in violation of RCW 69-.50.401(1)(d). He moved to suppress the methamphetamine as the fruit of an illegal search, arguing that his

---

[1] Having an open container of alcohol in a vehicle is a traffic infraction. RCW 46.61.519.

[2] The trial court found that Trevino called for backup when he returned to his car to check for warrants. Glossbrener challenged this finding at the Court of Appeals. *State v. Glossbrener*, noted at 107 Wn. App. 1041, 2001 Wash. App. LEXIS 1871, at *8 n.2, 2001 WL 894300, at *3 n.2 (Aug. 9, 2001). The court agreed that the finding was erroneous and that Trevino did not call for backup until after he had conducted the field sobriety tests. *Id.* The State does not challenge the Court of Appeals decision on this issue.

[3] A further search of Glossbrener's vehicle revealed additional controlled substances not at issue in this case.

detention while waiting for Vanicek and the search of the passenger compartment of his vehicle were contrary to the holdings in *State v. Kennedy*, 107 Wn.2d 1, 726 P.2d 445 (1986) and *State v. Tijerina*, 61 Wn. App. 626, 811 P.2d 241 (1991). The trial court denied Glossbrener's motion to suppress. The trial court found that Trevino had validly stopped Glossbrener for the headlight infraction and that Glossbrener's furtive movement prior to coming to a stop gave rise to a valid concern by Trevino that he might be hiding a weapon and perhaps an alcohol container. These concerns justified the search of the passenger side of the car and the subsequent discovery of the drug paraphernalia in plain view. That, in turn, justified Glossbrener's arrest and the search incident thereto, in which the methamphetamine was discovered. Glossbrener was convicted of possession of methamphetamine in a stipulated facts bench trial.

On appeal, Glossbrener challenged the methamphetamine evidence as the product of an illegal detention and search. The Court of Appeals, Division Three affirmed in an unpublished opinion.[4] The court held that Glossbrener's furtive movement before coming to a stop and his unsatisfactory explanation for the movement gave Trevino "justification to search for weapons in the passenger compartment areas where Mr. Glossbrener could reach."[5] The court further held that, in the interest of officer safety, Trevino was justified in waiting for backup to arrive before searching the car for a possible weapon. Thus, it concluded that any additional detention beyond what was authorized by statute for a traffic infraction was reasonable. Because the initial detention and search were valid, the court held that Glossbrener's subsequent arrest and search incident thereto were also valid. We granted Glossbrener's petition for review.[6]

---

[4] *Glossbrener*, 2001 Wash. App. LEXIS 1871, at *1, 2001 WL 894300, at *1.

[5] 2001 Wash. App. LEXIS 1871, at *7, 2001 WL 894300, at *3.

[6] *State v. Glossbrener*, 145 Wn.2d 1026 (2002).

## II

### *Detention*

Glossbrener first argues that Trevino did not have authority to detain him after Trevino determined that he was not intoxicated. Relying on *Tijerina*, he asserts that once the officer made a decision to not issue a citation, any further detention was improper. The Court of Appeals concluded that *Tijerina* was distinguishable because it had not involved a situation in which the officer was concerned that the suspect might have hidden a weapon in the vehicle. *State v. Glossbrener*, noted at 107 Wn. App. 1041, 2001 Wash. App. LEXIS 1871, at *8, 2001 WL 894300, at *3 (Aug. 9, 2001).

██ █ RCW 46.61.021(2) provides that an officer may detain a person stopped for a traffic infraction for a reasonable period of time "to identify the person, check for outstanding warrants, check the status of the person's license, insurance identification card, and the vehicle's registration, and complete and issue a notice of traffic infraction." In *Tijerina*, the court held that once an officer decides not to issue a citation and returns the driver's license and registration, "any further detention [has] to be based on articulable facts from which the [officer] could reasonably suspect criminal activity." 61 Wn. App at 629.

There is no dispute that Trevino's original stop of Glossbrener was valid. *Glossbrener*, 2001 Wash. App. LEXIS 1871, at *5, 2001 WL 894300, at *1. Thus, Trevino had the authority to detain Glossbrener long enough to check for warrants and to check Glossbrener's license, insurance and registration. *See* RCW 46.61.021(2). In addition, Trevino's suspicion that Glossbrener might be intoxicated allowed him to detain Glossbrener for an additional period of time in order to determine whether he was in fact intoxicated. *See State v. Lemus*, 103 Wn. App. 94, 101, 11 P.3d 326 (2000). However, any additional detention beyond the point at which Trevino determined that Glossbrener

was not intoxicated and that he was not going to cite Glossbrener for either the headlight infraction or the open container infraction would be justified only if Trevino had an objectively reasonable concern for officer safety. *See Kennedy*, 107 Wn.2d at 12 (detention, pursuant to *Terry v. Ohio*, 392 U.S. 1, 21-24, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), may include a limited search of the suspect's vehicle when necessary to assure officer safety). If Trevino were justified in searching the vehicle based on officer safety, it would be reasonable to allow him to detain Glossbrener while awaiting backup in order to safely conduct the search.

*Scope of Search Allowed under Kennedy*

Glossbrener next argues that *Kennedy* authorizes an officer to stop and frisk an occupant of a vehicle only based on officer safety concerns, but does not permit the officer to search the interior of the vehicle. He bases this argument on the facts of *Kennedy* as well as the distinction made in *Kennedy* between the scope of a search authorized by officer safety concerns and the scope of a search authorized incident to arrest in *State v. Stroud*, 106 Wn.2d 144, 720 P.2d 436 (1986).

The State responds that *Kennedy* allows an officer to search for weapons within the investigatee's immediate control, including the passenger compartment of a vehicle, if "articulable facts give rise to a concern [that] the suspect has hidden a weapon." State's Suppl. Br. at 9.

In *Kennedy*, this court evaluated whether a *Terry* "frisk" could be expanded to include the passenger compartment of a vehicle under article I, section 7 of the Washington Constitution based on officer safety concerns. 107 Wn.2d at 9-13.[7] There, the officer pulled Kennedy over because the officer suspected that he had just purchased marijuana. *Id.* at 3. Before stopping the car, the officer observed Kennedy

---

[7] This court has held that article I, section 7 "affords individuals greater protections against warrantless searches than does the Fourth Amendment." *Stroud*, 106 Wn.2d at 148.

"lean forward as if to put something under the seat." *Id.* Once they both stopped, the officer approached the car and asked Kennedy to get out. *Id.* Kennedy complied and stepped to the rear of the car. *Id.* The officer looked into the car to identify the passenger and then reached under the front seat. *Id.* at 3-4. He found a plastic bag containing marijuana. *Id.* at 4.

In upholding the search, we held that "an officer [may] make a limited search of the passenger compartment to assure a suspect person in the car does not have access to a weapon within the suspect's or passenger's area of control." *Id.* at 13. The court was careful to distinguish between the scope of a search authorized incident to arrest in *Stroud* and the scope of the search permitted based on officer safety, concluding that the latter allowed only for a more limited intrusion because "a *Terry* stop does not present the same dangers to the police officer or to evidence of a crime." *Id.* at 12. The court thus stated that the "scope of the search should be sufficient to assure the officer's safety. This means that the officer may search for weapons within the investigatee's immediate control." *Id.* Although the court indicated that the area to be searched may be expanded to include those areas within the immediate control of any passenger because a passenger "presents a similar danger to the approaching officer," it did not necessarily premise the search of the passenger compartment of the vehicle on the fact that a passenger remained in the vehicle. *Id.* at 12-13.

The Court of Appeals has interpreted *Kennedy* to allow a search of the passenger compartment of a vehicle based on officer safety even though the driver was outside the vehicle and no passengers were inside the vehicle. *State v. Larson*, 88 Wn. App. 849, 946 P.2d 1212 (1997). In *Larson*, the officer signaled Larson to pull over after he had observed Larson speeding on Interstate 5. *Id.* at 851. Larson, however, neither pulled over nor slowed down. *Id.* The officer observed Larson leaning forward and making movements toward the floorboard of his truck. *Id.* After traveling some

distance, Larson finally exited the freeway and eventually stopped in a hotel parking lot. *Id.* At the officer's direction, Larson got out of his truck. *Id.* The officer patted down Larson's clothing but did not allow Larson to reenter his truck. *Id.* The officer then stuck his head into the cab of the truck through the open door and noticed a "syringe, blackened spoon and a cotton ball" in a pocket in front of the driver's seat. *Id.* Upon picking the items up, he noticed a "paper bindle containing heroin." *Id.*

The Court of Appeals rejected Larson's argument that his movements inside the truck did not give rise to a reasonable concern for officer safety once he had been removed from the truck. *Id.* at 856-57. It found that the fact that no passenger remained in the truck, as had been the case in *Kennedy*, was not dispositive on the issue of whether the officer had reasonable concern for his safety. *Id.* at 856. The court instead reasoned that the circumstances and purpose of a traffic stop may justify a limited search of the passenger compartment of a vehicle even though neither the driver nor a passenger remains in the vehicle. *Id.* The court concluded that because the officer was conducting a routine traffic stop, which required him to obtain the driver's vehicle registration, Larson would eventually have to gain access to his truck in order to obtain the registration. *Id.* Thus the officer's concern for his safety was valid. *Id.* at 857.

We agree with the reasoning in *Larson* and conclude that *Kennedy* did not limit an officer's ability to search the passenger compartment of a vehicle based on officer safety concerns only to situations in which either the driver or passenger remain in the vehicle. Instead, a court should evaluate the entire circumstances of the traffic stop in determining whether the search was reasonably based on officer safety concerns.

### Objectively Reasonable Justification for Search

Glossbrener finally asserts that Trevino did not have an "objectively reasonable basis" for searching his vehicle

because of the time and events that followed Glossbrener's furtive movement. Specifically, he refers to Trevino's allowing Glossbrener to remain in the vehicle while he checked for outstanding warrants, Glossbrener's revealing a plausible reason for the furtive movement, Trevino's frisk of Glossbrener, and Glossbrener's full cooperation during the course of the investigation. The State responds that the Court of Appeals correctly concluded that Glossbrener's furtive movement along with his "unsatisfactory" answer gave rise to a valid concern for officer safety justifying the search of the passenger area of the vehicle. State's Suppl. Br. at 16.

The court in *Kennedy* did not clearly articulate what standard would be applied in determining whether an officer was justified in conducting a search of the passenger compartment of a vehicle based on officer safety. However, the court did indicate that the same concerns for safety that justify a frisk under the Fourth Amendment would justify a limited search of the passenger compartment of a vehicle under article 1, section 7 of the Washington Constitution. *Kennedy*, 107 Wn.2d at 10-11. In the context of a general *Terry* frisk, we have stated that a "reasonable safety concern exists, and a protective frisk for weapons is justified, when an officer can point to 'specific and articulable facts' which create an objectively reasonable belief that a suspect is 'armed and presently dangerous.'" *State v. Collins*, 121 Wn.2d 168, 173, 847 P.2d 919 (1993) (quoting *Terry*, 392 U.S. at 21-24). *See also State v. Horrace*, 144 Wn.2d 386, 399-400, 28 P.3d 753 (2001) (frisk of vehicle passenger justified under article 1, section 7 "only where the officer is able to point to specific, articulable facts giving rise to an objectively reasonable belief that the passenger could be armed and dangerous").

In the context of a protective search of a car based on officer safety concerns, the Court of Appeals has held that a "*Terry* stop and frisk may extend into the car if there is a reasonable suspicion that the suspect is dangerous and may gain access to a weapon in the vehicle.'" *State v. Terrazas*,

71 Wn. App. 873, 879, 863 P.2d 75 (1993) (quoting *State v. McIntosh*, 42 Wn. App. 573, 578-79, 712 P.2d 319 (1986)) . In *Larson*, the court indicated that a "protective search for weapons must be objectively reasonable, though based on the officer's subjective perception of events." 88 Wn. App. at 853-54 (citing *State v. Henry*, 80 Wn. App. 544, 552, 910 P.2d 1290 (1995)).

Applying this standard to Glossbrener's case, we conclude that although Trevino may have had a reasonable belief that Glossbrener was armed and dangerous when he first observed the furtive movement, any such belief was no longer objectively reasonable at the time he actually conducted the search because of the intervening actions of both Trevino and Glossbrener. First, Trevino articulated only two reasons justifying his belief that Glossbrener was armed and dangerous: (1) Glossbrener's furtive movement prior to coming to a stop and (2) Glossbrener's initial explanation for leaning towards the passenger side of the vehicle.[8] However, after being challenged, Glossbrener admitted that he had been attempting to hide an open container of alcohol, a traffic infraction.[9] In all other respects, Glossbrener cooperated with Trevino's investigation, including submitting to a field sobriety test and a frisk

---

[8] Although the State argues that the time of day of the traffic stop, approximately 11:45 P.M., also supports the reasonableness of the search, Trevino did not testify to this as a reason for his concern regarding officer safety and neither the trial court nor the Court of Appeals relied on it in upholding the search. *See* Report of Proceedings (RP) at 4-6; *Glossbrener*, 2001 Wash. App. LEXIS 1871, at *7, 2001 WL 894300, at *3 ("Mr. Glossbrener's furtive movements prior to stopping his vehicle and his unsatisfactory explanation that he was reaching for the glove box gave Officer Trevino justification to search for weapons in the passenger compartment areas where Mr. Glossbrener could reach."); Clerk's Papers at 13 (Conclusion of Law II) ("The Defendant's furtive gesture in reaching toward the passenger side of the car prior to the stop gave rise to valid concerns on the part of Officer Trevino that Defendant might be hiding a weapon.").

[9] At oral argument, Glossbrener asserted that it was unfair to characterize his initial response to Trevino as a "lie" because it was unclear from Trevino's question which movement he had been referring to—the one prior to coming to a stop or Glossbrener's retrieval of his documentation from the glove box after stopping. However, we need not decide whether Glossbrener knowingly lied about his movements because we conclude that even if he had, at the time the search was conducted, Trevino did not have an objectively reasonable belief that Glossbrener was armed and dangerous.

of his person. Trevino failed to articulate any other action by Glossbrener *during the course* of the investigation that made him suspect that Glossbrener was armed and dangerous.

Second, after initially questioning Glossbrener, Trevino allowed Glossbrener to sit in his car while he checked for warrants. It would seem that if Trevino were truly concerned for his safety, he would not have allowed Glossbrener to remain in his car while he conducted this part of his investigation. *Cf. Larson,* 88 Wn. App. at 851 (officer had driver immediately exit from truck and remain outside truck while he conducted limited search of cab of truck). Third, Trevino did not find any weapons on Glossbrener's person when he did the pat-down search.

Finally, it was not until Trevino had completed his investigation and determined that Glossbrener was not legally intoxicated that he decided to call for backup in order to search the passenger area of Glossbrener's vehicle where he had seen Glossbrener reach.[10] At this point in the investigation, the only thing left was for Glossbrener to leave.[11] Under these circumstances, we find Trevino did not have an objectively reasonable belief that he was in danger.

Although the cases relied on by the State to support the reasonableness of the search in this case involved furtive movements by either the driver or a passenger of the vehicle, they are otherwise distinguishable. In *Horrace,* 144 Wn.2d at 388, *State v. Watkins,* 76 Wn. App. 726, 728, 887 P.2d 492 (1995), and *State v. Wilkinson,* 56 Wn. App. 812, 813, 785 P.2d 1139 (1990), there was more than one person

---

[10] We do not hold that it was per se unreasonable for Trevino to wait for backup before conducting the search of Glossbrener's vehicle, but only that at the time he decided to conduct the search, Trevino no longer had an objectively reasonable belief that Glossbrener was armed and dangerous. If Trevino had called for backup immediately upon seeing the furtive movement or during the initial conversation with Glossbrener, the delay in searching the vehicle while awaiting the second officer's arrival may have been reasonable.

[11] Trevino did not cite Glossbrener for any traffic infractions. It is unclear from the record whether he would have cited Glossbrener for the open container violation if Glossbrener had not been arrested for controlled substance violation. *See* RP at 15.

in the vehicle when it was pulled over. Both *Horrace* and *Wilkinson* specifically address the reasonableness of the officer's *frisk of the suspect*, an issue not contested in this case, not the search of the vehicle. *Horrace*, 144 Wn.2d at 388; *Wilkinson*, 56 Wn. App. at 813. Furthermore, in *Horrace* and *Wilkinson*, the officers articulated reasons in addition to the furtive movements for their suspicion that the passengers might be armed and dangerous. *Horrace*, 144 Wn.2d at 389 (time of day and fact that passenger was wearing bulky jacket); *Wilkinson*, 56 Wn. App at 814 (driver's failure to pull over right away and officer's prior knowledge of criminal activity on the part of two of the vehicle occupants). In *Watkins*, the specific question addressed by the court was whether the continued investigation was justified, not whether the search was justified, because the officer had seen the butt of a revolver in plain view once the suspect stepped out of the vehicle. 76 Wn. App. at 729-31.

Most significantly, the searches in those cases were conducted at the first opportunity after the officer observed the furtive movement. *Horrace*, 144 Wn.2d at 389 (officer observed furtive movements by driver in area of passenger while checking whether driver had any outstanding warrants; pat-down of passenger conducted once officer had arrested driver for outstanding warrant and placed him in patrol car); *Watkins*, 76 Wn. App at 728 (officers witnessed furtive movements as vehicle was stopping; officers approached vehicle and asked for identification from passenger; passenger asked to exit vehicle immediately after providing evasive answer as to his identity); *Wilkinson*, 56 Wn. App. at 814 (search of passenger conducted immediately after officer approached vehicle for first time based on officer's observations of passenger's furtive movements before vehicle stopped).

Although *Larson* is more similar to this case than *Horrace*, *Watkins*, or *Wilkinson*, it is also distinguishable. As in this case, the officer in *Larson* observed the driver make furtive movements before coming to a stop. 88 Wn.

App at 851. However, the driver in *Larson* did not immediately stop when he was signaled but instead continued to drive for some distance. *Id.* As in *Horrace, Watkins,* and *Wilkinson,* the search was conducted at the first opportunity following the events giving rise to the officer's concern for safety. *Id.* (officer, upon his initial contact with driver, immediately asked him to get out of his truck, patted him down for weapons, and then had driver remain outside of truck while officer conducted a visual of the cab of truck). In this case, Trevino had several opportunities to search Glossbrener's car prior to the time the search was actually done, including the time at which Trevino initially approached the car and before conducting the field sobriety tests.

More importantly, in upholding the search in *Larson,* the court specifically relied on the fact that Larson would have to return to his vehicle to obtain his registration in order to carry out the traffic stop, which in turn would give him access to any weapon he may have concealed inside the truck. *Id.* at 857. In Glossbrener's case, Trevino's investigation was complete. There was no need for Glossbrener to produce any additional documentation from the vehicle in order for Trevino to have cited him for either the open container or headlight infraction, which was not done in this case.

### III

We therefore hold that at the time the search was conducted Trevino did not have an objectively reasonable belief that Glossbrener was armed and dangerous. Thus, the search was not justified based on officer safety concerns.[12] Because we find the search of Glossbrener's vehicle

---

[12] At oral argument the question was raised whether the search could be upheld based on the open container violation alone. RCW 46.61.519 makes it a "traffic infraction" for a person to have an open container of alcohol while operating a vehicle on a highway. Although Trevino likely had probable cause to believe that Glossbrener had violated RCW 46.61.519, it is unclear whether an officer may conduct a warrantless search based on a violation of a civil infraction. *See* 12 ROYCE

invalid, the resulting discovery of methamphetamines on Glossbrener's person should have been suppressed as a fruit of the illegal search. *State v. Ladson*, 138 Wn.2d 343, 359, 979 P.2d 833 (1999) ("When an unconstitutional search or seizure occurs, all subsequently uncovered evidence becomes fruit of the poisonous tree and must be suppressed.").

The decision of the Court of Appeals is reversed.

ALEXANDER, C.J., and SMITH, JOHNSON, SANDERS, IRELAND, CHAMBERS, and OWENS, JJ., concur.

MADSEN, J., concurs in the result.

[No. 70659-0.   En Banc.]
Argued September 13, 2001.     Decided July 11, 2002.

---

A. FERGUSON, JR., WASHINGTON PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 2707, at 561 (1997) ("A law enforcement officer can seize any property [without a warrant] which he has probable cause to believe constitutes evidence of a *crime*[.]") (emphasis added). Because Trevino was primarily concerned with hidden weapons when he conducted the search, *see* RP at 8, and because this issue was not briefed by the parties or addressed by the Court of Appeals, we decline to address it now. *See John Doe v. Puget Sound Blood Ctr.*, 117 Wn.2d 772, 785, 819 P.2d 370 (1991) ("the court should not engage in conjectural resolution of issues present, but not briefed"); RAP 13.7(b) ("Supreme Court will review only the questions raised in the . . . petition for review").